234     SUPREME COURT OF WISCONSIN.     [Feb.

State ex rel. Wisconsin T., L., H. & P. Co. v. Circuit Court, 162 Wis. 234.

STATE EX REL. WISCONSIN TRACTION, LIGHT, HEAT & POWER
COMPANY, Plaintiff in error, vs. CIRCUIT COURT FOR
WINNEBAGO COUNTY, Defendant in error.

*November 18, 1915—February 1, 1916.*

Certiorari: *Jurisdiction: Public utilities: Indeterminate permits:*
*Condemnation of "existing plant" operated in conjunction with*
*utilities in other cities.*

1. Absence of legal right on the part of a city to condemn the plant
of a public utility therein goes to the jurisdiction of the circuit
court to entertain an action brought by the city for that purpose
under sec. 1797m—80, Stats. 1913, and *certiorari* will lie to re-
view the court's proceeding.
2. Under sec. 1797m—77, Stats. (by which licenses, permits, and
franchises granted to public utilities before the Public Utility
Law took effect were converted into indeterminate permits),
and sec. 1797m—80 (prescribing the method to be pursued by a
municipality in acquiring by condemnation an existing plant
operated under an indeterminate permit provided in sec.
1797m—77), municipalities have, by necessary implication, the
power to condemn such existing plants, although that power is
not expressly granted.
3. Where, before the Public Utility Law took effect, a city had
granted to a corporation a franchise to furnish light and power
to its residents, such grant constituted the corporation a public
utility and a separate entity in that city, even though the oper-
ating power was procured from a source outside of the city
which also furnished power to other utilities owned by the same
corporation in other cities.
4. The franchise in such case having become an indeterminate per-
mit under sec. 1797m—77, Stats., the city might, under sec.
1797m—80, condemn the existing plant therein, irrespective of
the fact that it was owned or operated in conjunction with other
utilities.

CERTIORARI to review a judgment of the circuit court for
Winnebago county: BYRON B. PARK, Judge. *Writ quashed.*

Pursuant to sec. 1797m—80, Stats. 1913, the city of Me-
nasha brought an action in the circuit court to determine the
necessity of taking the public utility plant of the *Wisconsin*

*Traction, Light, Heat & Power Company* located in said city. The jury found that public necessity required the taking and a judgment in accordance with the verdict was entered. To review such judgment the defendant obtained a writ of *certiorari.*

For the plaintiff in error there were briefs by *Van Dyke, Shaw, Muskat & Van Dyke,* and oral argument by *James D. Shaw.*

For the defendant in error there was a brief by *D. K. Allen,* attorney, and *Silas Bullard* and *John C. Thompson,* of counsel, and oral argument by *Mr. Allen* and *Mr. Thompson.*

The following opinion was filed December 7, 1915:

VINJE, J. The defendant owns an electric power plant at Appleton which furnishes that city with street lighting and the residents thereof with light and power. It provides the same service for Neenah. In Menasha it furnishes the residents with light and power. Its franchise for so doing was granted it by the city in 1904. In 1911 by force of sec. 1797m—77, Stats., such franchise became an indeterminate permit. The power plant at Appleton is ample to furnish all the electric power needed for the purposes above specified. The city of Menasha is seeking to condemn the property of the defendant located within its corporate limits actually used and useful for the convenience of the public. It does not contemplate taking power from the Appleton plant as it has a power plant of its own. The defendant claims that the city cannot dismember its plant and take only a portion thereof; that under the Public Utility Law, and especially by force of secs. 1797m—76 and 1797m—78, only the municipality in which the major part of the property of the utility lies can purchase or condemn, and since the major portion of defendant's property lies in Appleton, only about one fifth of it being in Menasha, Appleton is the only city that can condemn. If

this be true the contentions go to the right of the city to condemn and to the jurisdiction of the court to entertain the action, and *certiorari* will lie to review the court's proceeding.

Sec. 1797m—76 provides that every license, permit, or franchise thereafter granted shall have the effect of an indeterminate permit and shall be "subject to the provision that the municipality in which the major part of its property is situate may purchase the property of such public utility."

Sec. 1797m—78 provides that every public utility accepting an indeterminate permit thereafter granted shall "be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate."

Sub. 4, sec. 1797m—79, gives any municipality the power to acquire by purchase the property of any public utility operating under any voluntary indeterminate permit. It does not cover the case of a utility operating under an indeterminate permit created by sec. 1797m—77. This subdivision and the two previous sections mentioned relate to what may be termed sales of the properties of public utilities to which they consented upon accepting an indeterminate permit and which they are compelled to make.

Sub. 2, sec. 1797m—79, gives any municipality the power to purchase, by agreement with any public utility, any part of any plant. This refers to a voluntary sale which the utility is not required by law to make. The subsection merely empowers a municipality to make such a purchase if the utility is willing to sell. These statutes were all a part of the original Public Utility Law, ch. 499, Laws of 1907, and they are the only ones that confer upon municipalities the power to purchase.

Under the original law owners of franchises were not compelled to surrender them for an indeterminate permit. The legislature, therefore, contemplating that municipalities might desire to acquire the property of a utility operating

under an original franchise, or without permit, granted to them, by sub. 3 of sec. 1797m—79, the power of condemning such utilities.    And in secs. 1797m—80 et seq. they prescribed the method of so doing.

Sub. 1, sec. 1797m—79, gave municipalities the power to construct and operate·a plant or any part thereof.

These provisions of the original Public Utility Law empowered municipalities (1) to construct and operate a plant or any part thereof, (2) to purchase by agreement with a public utility any part of its property, (3) to purchase the plant of any public utility operating under an indeterminate permit, and (4) to condemn the property of a public utility not operating under an indeterminate permit, or operating without a permit.    The scheme of acquisition as the law then stood ·was apparently complete.    But in 1911 the legislature by ch. 596, now sec. 1797m—77, in invitum, converted every license, permit, or franchise granted prior to July 11, 1907, into an indeterminate permit with all its powers and limitations except as provided by sec. 1797m—80.    The first sentence of this section was amended by striking out the words "a license, permit or franchise existing at the time this act took effect" and substituting in their place the words "an indeterminate permit provided in section 1797m—77," making the section read, "If the municipality shall have determined to acquire an existing plant then operated under an indeterminate permit provided in section 1797m—77, . . . such municipality shall bring an action," etc.    It is evident that upon all franchises becoming indeterminate permits by force of sec. 1797m—77 there remained nothing upon which sub. 3, sec. 1797m—79, could act except public utilities operating without a permit or franchise.    That the legislature so understood is evidenced by the fact that they struck out of sec. 1797m—80 the words above referred to, which obviously related to sub. 3, sec. 1797m—79, and substituted in their place apt words referring to sec. 1797m—77.    The latter section

as it appears in the Statutes of 1913 was first enacted in 1911.   But in amending sec. 1797m—80 to correspond with the provisions of sec. 1797m—77 they apparently overlooked the fact that the express power of condemnation granted to municipalities by sub. 3, sec. 1797m—79, no longer had anything to act upon except public utilities without any permit or franchise whatsoever.   But that the legislature considered that municipalities had the power to condemn the property of public utilities having indeterminate permits forced upon them by sec. 1797m—77 is evident from the language of that section taken in connection with sec. 1797m—80. The latter section specifically provides the method to be pursued in condemning the property of a utility acquiring an indeterminate permit by force of sec. 1797m—77.   To say that they provided the procedure to be followed and withheld the power would be absurd.   The two sections by necessary implication grant the power.   Singularly enough sec. 1797m—80 as it stood originally and as now amended does not in terms provide the procedure for condemning a utility operating without any permit or franchise.

Since this proceeding does not come under sub. 4 of sec. 1797m—79 or under any part of the statute dealing with a purchase by consent under a voluntary indeterminate permit, secs. 1797m—76 and 1797m—78, so much relied upon by defendant, do not appear to throw much light upon the question to be determined, namely, Can the plaintiff condemn the property of the Menasha public utility located within the corporate limits of that city?   Sec. 1797m—80 provides for the condemnation of an existing plant then operated under an indeterminate permit provided in sec. 1797m—77.   The existing plant here spoken of is the existing plant of a public utility operating under a compulsory indeterminate permit. Sec. 1797m—1 defines a public utility as used in the statute to "mean and embrace every corporation, company, individual, association of individuals, their lessees, trustees, or re-

ceivers appointed by any court whatsoever, and every town, village, or city that now or hereafter may own, operate, manage, or control any plant or equipment or any part of a plant or equipment within the state, for the conveyance of telephone messages or for the production, transmission, delivery, or furnishing of heat, light, water, or power either directly or indirectly to or for the public, or that now or hereafter may own, operate, manage, or control any toll bridge wholly within the state." It follows from this definition that the property or plant of a public utility may consist of a part of a plant as the word "plant" is used when meaning a physical operating unit consisting of one or more parts. When in 1904 the city of Menasha granted a franchise to defendant to furnish commercial lighting and power to its residents, such grant constituted the defendant a public utility in Menasha. The fact that it was already one elsewhere or became one later is immaterial. The Menasha public utility thus created was an entity though owned and operated in connection with other public utilities. The change of its franchise to a compulsory indeterminate permit did not affect its separate entity. It is still a public utility in Menasha, and it is the property of that utility the city is seeking to condemn. The fact that the defendant operated another utility in Appleton and another in Neenah does not affect the separate entity of the Menasha utility. Nor does the fact that the Menasha utility gets its current from the Appleton utility, though the owner of both is the same, change the situation. So far as the record discloses, the plaintiff is seeking to condemn all the property belonging to the Menasha utility, but it does not propose to secure its current from the same source. It intends to generate its own current instead of buying it from the Appleton utility as the Menasha utility has heretofore done. For whatever may be the terms and conditions upon which the current has heretofore been supplied to the Menasha utility, the transaction amounts to a purchase by the latter and must

be so considered in rate-making for the Menasha utility. Defendant fails to distinguish between the property belonging to several utilities and that belonging to one. The distinction is as vital when there is one owner of all as it is when there are separate ownerships. The statute deals with the property of a utility as an entity, and such property is subject to condemnation separately though used and owned in connection with that of other utilities. The construction placed upon the statutes by defendant would render it impossible for a municipality to condemn a utility serving it if the owner thereof owned or operated utilities in other cities in the aggregate larger than that sought to be condemned, which were connected with such utility by a common power plant or otherwise. Under such a construction public utilities in a dozen or more cities served by a power station located in the country could never be condemned by the municipalities which they serve because the major portion of their property would not be situate therein. At the time the Public Utility Law was passed it was common knowledge that a central power plant often supplied two or more utilities in different municipalities. The law did not intend to and did not put such utilities upon a different basis as to condemnation than those having their own power plants, and hence it provided that the existing plant of any utility may be separately condemned irrespective of its physical connection with other utilities. Under the old law utilities were granted franchises by municipalities; under the present law they are granted certificates of convenience and necessity by the railroad commission. Each when operating under its grant or the substituted indeterminate permit constitutes a complete separate public utility subject to condemnation by the municipality originally granting the franchise or for which the certificate of convenience and necessity was granted, irrespective of the fact that it may be owned or operated in conjunction with other utilities. Any other construction would nullify the statutory definition of a public utility. It follows that the city of

State ex rel. Wisconsin T., L., H. &. P. Co. v. Circuit Court, 162 Wis. 234.

Menasha, herein called the plaintiff, has the power to condemn as proposed and that the writ of *certiorari* must be quashed.    Plaintiff is entitled to costs against the relator, herein called the defendant.

*By the Court.*—Writ quashed.

A motion by the plaintiff in error for a rehearing was denied February 1, 1916, and the following opinion was filed February 4, 1916:

PER CURIAM.    Upon the motion for a rehearing our attention is called to the use of the word "franchise" in the sentence of the opinion stating that "When in 1904 the city of Menasha granted a franchise to defendant to furnish commercial lighting and power to its residents, such grant constituted the defendant a public utility in Menasha," and it is pointed out that such use is incorrect because the franchise is granted by the state and not by the city.    No question as to the source of the franchise was in the case and hence the use of the term could not mislead in that respect.    Moreover, sub. 7 of sec. 1778, Stats., says, "No corporation to build and operate electric light system or systems for the transmission of steam or hot water for heat, shall have any right hereunder in any city or village until it has obtained a franchise from such city or village, as now provided by law."    The word was used to denote this grant from the city called a franchise in the statute itself.    It was not intended to indicate that the original source of defendant's franchise was the grant from the city and not that from the state.

The defendant came under the provisions of the indeterminate permit by operation of law.    A question is suggested as to its right to recover damages due to a severance of its property heretofore operated together.    It is claimed that a denial of such right deprives defendant of its property without due process of law.    The opinion was purposely silent upon this question because it was not before us for adjudication.

The motion for a rehearing is denied with $25 costs.